UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMAR BURTON,

                                    Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

                                    Defendants.

Case No. 20-cv-12501
Honorable Matthew F. Leitman
Magistrate Judge Elizabeth A. Stafford

---

**REPORT AND RECOMMENDATION TO GRANT DEFENDANT
MARTINO'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 106)
AND GRANT IN PART AND DENY IN PART MDOC DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 110)**

---

## I.      Introduction

Plaintiff Lamar Burton, a parolee under the Michigan Department of

Corrections' (MDOC) jurisdiction, filed this pro se civil rights action under

42 U.S.C. § 1983, alleging constitutional violations during his incarceration

at the Macomb Correctional Facility (MRF).  ECF No. 1.  The Honorable

Matthew F. Leitman referred the case to the undersigned for all pretrial

matters under 28 U.S.C. § 636(b)(1).  ECF No. 24.

Defendant Juliana Martino and MDOC Defendants Brannon

Freiburger, Kristopher Patterson, Lisa Adray, James McCoy, and Caroline

Rivard-Babisch move for summary judgment.  ECF No. 106; ECF No. 110.

The Court **RECOMMENDS** that Martino's motion for summary judgment be

**GRANTED** and that the MDOC defendants' motion for summary judgment

be **GRANTED IN PART AND DENIED IN PART**.  The excessive force

claims against Freiburger and Patterson should proceed, but the claims

against Adray, McCoy, and Rivard-Babisch should be dismissed.

## II.    Background

In February 2019, Burton was ordered to leave an MRF recreation

room and return to his cell for lockdown.  ECF No. 110-2, PageID.1758;

ECF No. 110-3, PageID.1771.  Corrections officer Brett Stemen

approached Burton and ordered him to go to his cell.  ECF No. 110-3,

PageID.1772; ECF No. 110-4, PageID.1781.  Stemen reached for the food

tray Burton was carrying, but Burton moved it out of the way, bumped his

shoulder against Stemen's chest, and walked away.  ECF No. 110-3,

PageID.1772; ECF No. 110-4, PageID.1781-1782, Attach. C, HU4 Base

Video.  Stemen called for assistance, stating that Burton had assaulted

him.  ECF No. 110-4, PageID.1781-1782.

Freiburger and Patterson responded to the call and helped restrain

Burton with handcuffs.  ECF No. 110-2, PageID.1758-1759, Attach. C, HU4

D-Wing Video; ECF No. 110-5, PageID.1793.  They held Burton's arms and

were to escort Burton to segregation.  ECF No. 110-2, PageID.1759,

Attach. C, HU4 D-Wing Video; ECF No. 110-3, PageID.1774.  While

waiting for the stairs to clear of other prisoners, Burton's legs suddenly

buckled, and he dropped toward the floor.  ECF No. 110-2, PageID.1759,

Attach. C, HU4 D-Wing Video; ECF No. 110-3, PageID.1773-1774; ECF

No. 110-5, PageID.1793.  Believing that Burton was passively resisting,

Freiburger and Patterson took Burton down to the floor and onto his

stomach.  ECF No. 110-2, PageID.1759-1760, Attach. C, HU4 D-Wing

Video; ECF No. 110-5, PageID.1793-1794.  Burton says that his knees

buckled involuntarily and that Freiburger and Patterson "slammed" him to

the floor headfirst.  ECF No. 110-3, PageID.1773-1774; ECF No. 126,

PageID.2624.  Burton asserts that Freiburger and Patterson used

excessive force in violation of the Eighth Amendment during this takedown.

After he was placed in segregation, Burton was taken to the

healthcare unit for treatment of injuries from the takedown.  ECF No. 110-3,

PageID.1775.  Burton claims that he was seen by Adray and McCoy, who

rendered no treatment after learning that he was injured while allegedly

assaulting Stemen.  *Id.*, PageID.1775-1776.  Burton claims that Adray and

McCoy were deliberately indifferent to his medical needs in violation of the

3

Eighth Amendment and retaliated against him in violation of the First
Amendment.

In the months after the February 2019 incident, Burton was
diagnosed with a neck sprain and was seen by different providers,
including nurse practitioner Martino.  ECF No. 106-1, PageID.1532-1554.
In June 2019, Martino asked the assistant chief medical officer (ACMO) to
review Burton's records to determine his need for a cervical collar.  *Id.*,
PageID.1554.  The ACMO deferred review of the cervical collar pending
further testing.  *Id.*, PageID.1588-1559.  Burton refused to have the testing
performed.  *Id.*, PageID.1577, 1587-1591, 1594, 1607, 1614-1617.  Martino
also directed another nurse to confiscate an unapproved cervical collar that
Burton obtained during a medical visit at an outside facility.  *Id.*,
PageID.1572.  Burton asserts an Eighth Amendment deliberate indifference
claim against Martino based on her refusal to give him a cervical collar.[1]

Finally, MDOC healthcare providers gave Burton an arm brace in
2017 or 2018.  ECF No. 126, PageID.2624-2625.  When the arm brace was

---

[1] Burton also asserted a retaliation claim against Martino, alleging that she
withheld pain medication after he had surgery.  ECF No. 1, PageID.8; *see
also* ECF No. 4, PageID.254-255; ECF No. 121, PageID.2539, 2541.  But
this Court found, and Judge Leitman affirmed, that Burton only exhausted
the deliberate indifference claim stemming from the cervical collar.  ECF
No. 54, PageID.1089-1090 (citing ECF No. 36-4, PageID.469); ECF No.
58.

stolen in February 2019, Burton received a new one but complained that it fit poorly because it did not have metal rods like the first brace. *Id.*, PageID.2625-2626; ECF No. 106-1, PageID.1533.  Nurse Rivard-Babisch told Burton that prison regulations prohibited arm braces with metal rods, so she placed wooden tongue blades inside the new brace.  ECF No. 106-1, PageID.1533; ECF No. 110-3, PageID.1777.  Burton filed a grievance against Rivard-Babisch and alleges that she later refused him a metal arm brace in retaliation for the grievance.  *See* ECF No. 36-5, PageID.572; ECF No. 110-3, PageID.1777-1778.  Burton asserts deliberate indifference and retaliation claims against Rivard-Babisch based on her refusal to give him a metal arm brace.[2]

### III.  Analysis

### A.

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's

---

[2] Burton also claimed that Rivard-Babisch retaliated against him by refusing to provide treatment when he had a severe infection on his arm.  ECF No. 1, PageID.9; ECF No. 110-3, PageID.1777-1778; ECF No. 118, PageID.2470.  But the only claims that Burton exhausted through the grievance process stemmed from Rivard-Babisch's denial of a metal arm brace.  *See* ECF No. 54, PageID.1088-1089 (citing ECF No. 36-5, PageID.572); ECF No. 58.

function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must specify the portions of the record that show the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing a genuine issue for trial. *Id.* at 324. The Court must view the factual evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The opposing party "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009) (internal quotation marks omitted). "[T]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Id.* (internal quotation marks omitted). "Conclusory

statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560.

**B.**

The Court first addresses Burton's excessive force claims against Freiburger and Patterson. Whether summary judgment should be granted on those claims turns on an assessment of subjective and objective components. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). The subjective component addresses the officials' state of mind, and whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (cleaned up). When determining whether the subjective component is met, courts consider (1) the need for the use of force, (2) whether the force used was proportional to the need for force, (3) the extent of the plaintiff's injuries, (4) the threat reasonably perceived by the prison official, and (5) efforts made to temper the severity of the force. *Id.* at 581.

"The objective component requires the pain inflicted to be sufficiently serious. This component requires a contextual investigation, one that is responsive to contemporary standards of decency." *Id.* at 580 (cleaned up). But even when the inmate suffers no serious injury, prison officials who use force maliciously to cause harm violate the Eighth Amendment.

7

"Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  *Id.* at 581 (cleaned up).

As to the subjective component, Freiburger and Patterson say they believed that Burton was using a "dead weight" tactic to passively resist being escorted to segregation.  ECF No. 110-2, PageID.1759; ECF No. 110-5, PageID.1793.  They assert that "[i]t is a common tactic for prisoners to passively resist officers while restrained and being escorted by going 'dead weight' with their legs and falling to the ground."  ECF No. 110-2, PageID.1760; ECF No. 110-5, PageID.1794.  Since he was holding Burton by the arm, Freiburger claims that his own arm twisted downward when Burton fell.  ECF No. 110-2, PageID.1759.  Freiburger and Patterson state that "reasonable force was required to gain Burton's compliance and ensure the safety and security of both Burton and staff," and that they used the minimum amount of force necessary to gain Burton's compliance.  *Id.*; ECF No. 110-5, PageID.1793-1794.  They did so by "taking prisoner Burton forward, to the floor, and onto his stomach."  ECF No. 110-2, PageID.1759; ECF No. 110-5, PageID.1794.

Burton's version of events differs.  He asserts that he complied with Freiburger and Patterson's orders to put his hands behind his back for

8

handcuffing.  ECF No. 110-3, PageID.1773.  Burton claims that his legs involuntarily buckled because he was anxious and emotionally overwhelmed.  *Id.*, PageID.1773-1774.  And when Burton began to drop to the floor, Freiburger and Patterson lifted him up by his arms and slammed him to the floor headfirst with such force that his glasses broke and the side of his head was bleeding.  *Id.*; ECF No. 126, PageID.2622, 2624.

Freiburger and Patterson submit surveillance video of the incident, arguing that it contradicts Burton's claims.  ECF No. 110, PageID.1735-1736.  The video shows that four officers approached Burton, who turned around and allowed them to handcuff his arms behind his back.  ECF No. 110-2, Attach. C, HU4 D-Wing Video at 0:05-0:19.  After Burton was cuffed, two officers flanked him on either side, and two officers stood in front of him.  *Id.* at 0:25.  The group waited at the top of the stairs for other prisoners to pass.  *Id.* at 0:25-0:40.  The moment when Burton's knees buckled is partially obscured, but he suddenly bent at the waist and dropped toward the floor.  *Id.* at 0:41.  Freiburger and Patterson then lifted Burton almost imperceptibly and propelled him forward and down to the floor.  *Id.* at 0:41-0:43.  Burton hit the floor headfirst.  *Id.*

At the summary judgment stage, courts must view the evidence as "depicted by the videotape," and "when opposing parties tell two different

9

stories, one of which is blatantly contradicted by the record, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (cleaned up).  In the Court's view, the video is inconclusive. Because the footage was shot from a distance, it is unclear how much force Freiburger and Patterson applied when they propelled Burton down to the ground.  A jury could reasonably find that the video aligns with Burton's allegation that the officers "slammed" him to the ground with a great deal of force—rather than *de minimis* force, as Freiburger and Patterson argue. And since "video cannot depict state of mind," it is "rarely, if ever, conclusive on questions of intent, such as whether Defendants acted with the intent to cause Plaintiff harm." *Cummings v. Klee*, No. 14-10957, 2015 WL 1412601, at *5 (E.D. Mich. Mar. 26, 2015).

Taking Burton's version of events as true, a reasonable jury could find that Freiburger and Patterson lacked a good-faith reason to use amount of force alleged.  Burton was injured during the takedown.  Medical records from the date of the incident show that Burton had only a minor abrasion on his forehead, though he also complained of arm pain.  ECF No. 110-7, PageID.2421.  But five days later, Burton began complaining of neck pain and was diagnosed with a strain or sprain of the cervical neck. *Id.*, PageID.2393, 2420.  Burton complained of neck pain for months after

10

the incident, and other medical providers diagnosed a cervical strain or sprain and noted his decreased range of motion.  *See, e.g.*, *id.*, PageID.2282, 2344, 2349, 2374.  Viewed in Burton's favor, this evidence suggests that Freiburger and Patterson used a good deal of force against Burton.  And "[t]he use of such force, while certainly not dispositive, makes it more likely that [Freiburger and Patterson] acted with malice."  *See Cordell*, 759 F.3d at 583.

The amount of force Freiburger and Patterson allegedly used could be found disproportionate to the threat that Burton posed.  Even crediting the officers' subjective belief that Burton was using a dead-weight tactic, they admit that Burton was restrained and only passively resisting.  *See* ECF No. 110-2, PageID.1759; ECF No. 110-5, PageID.1793.  The video shows that Burton complied with handcuffing and was surrounded by four officers.  While Freiburger and Patterson stated that using force was necessary to ensure the safety and security of Burton and staff, they do not explain what threat Burton posed.  *See* ECF No. 110-2, PageID.1759; ECF No. 110-5, PageID.1793.  A jury could reasonably find that Freiburger and Patterson acted maliciously by taking down a prisoner who was restrained and only passively resisting.  *See Cordell*, 759 F.3d at 583-84 (denying summary judgment where an officer rammed a restrained prisoner headfirst

into a wall when the prisoner turned his body and attempted to face the

officer as he was being escorted down a hall); *Degolia v. Kenton Cnty.*, 381

F. Supp. 3d 740, 765 (E.D. Ky. 2019) (holding that it was objectively

unreasonable for an officer to take down a detainee who passively resisted

by using a dead-weight tactic but who otherwise posed no threat);

*Cummings*, 2015 WL 1412601, at *5 (denying summary judgment where

officers used force to restrain the plaintiff and to carry him to segregation

after he stiffened his body, slid out of a wheelchair, and refused to

cooperate with being returned to his cell).

There is also no evidence that Freiburger or Patterson tried to temper

the force they used against Burton.  They claim in conclusory fashion that

they used the minimum amount of force necessary to gain Burton's

compliance.  ECF No. 110-2, PageID.1759; ECF No. 110-5, PageID.1793-

1794.  But the Court need not accept such bare assertions when they lack

supporting detail and conflict with other evidence.  *See Cordell*, 759 F.3d at

583-84.

Freiburger and Patterson argue that Burton's claim that his legs

buckled because of anxiety "defies belief," citing Burton's testimony that he

has been handcuffed between 30 and 100 times, including after a fight or

for security reasons.  ECF No. 110, PageID.1736 (citing ECF No. 110-3,

12

PageID.1774).  But Burton explained that he became overwhelmed and anxious because he feared that Stemen's assault allegations would delay his approaching release date.  ECF No. 110-3, PageID.1773.  He also explained that he was upset because he believed that Stemen fabricated the assault claim and feared being attacked by other officers in retaliation for the alleged assault.  *Id.*, PageID.1773-1774.  Accepting Freiburger and Patterson's position would require the Court to find that Burton's statements lack credibility, which is not permitted at the summary judgment stage.  *See Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) ("In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." (cleaned up)).

A jury could also reasonably find that the objective component of Burton's excessive force claim is met.  First, Burton's injuries described above could be viewed as serious enough "to offend contemporary standards of decency."  *See Cordell*, 759 F.3d at 585.  Second, as discussed, a jury could find that Freiburger and Patterson's use of force "violated contemporary norms" because it was a disproportionate response to Burton dropping to the ground.  *See id.*  Burton was surrounded by four officers, was in handcuffs, and offered only passive resistance.

Thus, Freiburger and Patterson should be denied summary judgment.

13

**C.**

The Court turns to the deliberate indifference claims asserted against Adray, McCoy, Martino, and Rivard-Babisch.  The Eighth Amendment protects against the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII; *Estelle v. Gamble*, 429 U.S. 97, 101 (1976).  Because the government must provide medical care for those it has incarcerated, "[d]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain," and thus violates the Eighth Amendment.  *Estelle*, 429 U.S. at 103-04.  But a plaintiff must show more than a mere failure to provide adequate medical care to prove a constitutional violation.  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).  "A constitutional violation arises only when a prison official exhibits deliberate indifference to a prisoner's serious illness or injury that can be characterized as obduracy and wantonness rather than inadvertence or" good-faith error.  *Id.* (cleaned up).

To prevail on a deliberate indifference claim, an inmate must satisfy both an objective and subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  For the objective component, Burton must show that defendants' acts or omissions deprived him of "the minimal civilized measure of life's necessities" and posed "a substantial risk of serious

14

harm." *Id.* The subjective component requires proof that the prison official acted with deliberate indifference, meaning that the official knew of but disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010).

### 1.

Adray and McCoy[3] claim that Burton cannot establish the objective or subjective component as it relates to his treatment after the February 2019 incident. ECF No. 110, PageID.1740-1745.

To satisfy the objective component, an inmate who received treatment but claims that it was inadequate must show that his care was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart*, 894 F.3d at 737 (cleaned up). The plaintiff must offer medical evidence, such as expert testimony, showing "that the provided treatment was not an

---

[3] McCoy argues that Burton cannot show his personal involvement because he was not involved in Burton's medical care after the February 2019 incident. ECF No. 110, PageID.1732-1733; ECF No. 110-8. Burton testified that both Adray and McCoy treated him. The Court need not resolve this dispute, as Burton cannot show that McCoy was deliberately indifferent to his medical needs, even assuming that he took part in Burton's care.

adequate medical treatment of [his] condition or pain." *Id.* (cleaned up). The plaintiff must also offer "verifying medical evidence" to show the harm caused by the inadequate treatment. *Id.* at 738; *see also Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (even when a medical need was serious, a prisoner who received treatment must offer verifying medical evidence showing that the treatment was inadequate and resulted in harm).

After the February 2019 incident, Burton went to the healthcare unit complaining of arm pain and that the side of his head was bloody. ECF No. 110-3, PageID.1775. Burton testified that he saw Adray and McCoy and requested to go to the emergency room. *Id.* Adray and McCoy initially examined him but allegedly provided no treatment after learning that he was injured while reportedly assaulting Stemen. *Id.* at PageID.1775-1776. Burton stated that Adray and McCoy did not clean his head wound and only gave him a bag of ice. *Id.*

The medical record of the visit contradicts Burton's testimony. That record shows that he complained of pain and stiffness in his right arm and an abrasion on his forehead. ECF No. 110-7, PageID.2421, 2424. Adray took Burton's vital signs and examined him, noting that he was alert and oriented, with clear speech and pupils that were equal, round, and reactive to light. *Id.* She observed that Burton's range of motion was normal when

16

relating events to another nurse and when he put his arms behind his back to be handcuffed. *Id.* at PageID.2421. But he did not cooperate when Adray tried to assess his range of motion. *Id.* Adray observed no swelling, redness, or bruising to Burton's right arm and cleaned the minor abrasion on his forehead, which required no dressing. *Id.* She also prescribed Tylenol and gave him ice for his forehead. *Id.* Adray's affidavit aligns with the medical records. ECF No. 110-6.

Although the Court must draw all inferences in favor of Burton, "it is not required to adopt a non-moving party's version of the facts which is blatantly contradicted by the record and which no reasonable jury could believe." *Nichols v. Unknown Party #1*, No. 1:16-cv-1392, 2018 WL 1414805, at *5 (W.D. Mich. Feb. 27, 2018), *adopted*, 2018 WL 1399477 (W.D. Mich. Mar. 20, 2018). Courts have held that "the information in properly authenticated medical records can contradict a party's testimony such that no genuine dispute of material fact remains." *Annabel v. Heyns*, No. 2:12-cv-13590, 2016 WL 4761604, at *6 (E.D. Mich. July 26, 2016), *adopted*, 2016 WL 4729561 (E.D. Mich. Sept. 12, 2016) (*Williams v. Mattson*, 221 F.3d 1337, at *1 (6th Cir. 2000)); *see also Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls,

17

examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").

Burton relies on the same medical record but added a handwritten note repeating his testimony that Adray never cleaned his head wound or gave him Tylenol; he says that another nurse gave him Tylenol the next day.  ECF No. 118, PageID.2479.  But there is no record that Burton sought more treatment for his head wound.[4]  And Adray ordered the Tylenol to be given at a medication pass, which aligns with Burton's claim that another nurse gave it to him the next day.  *See* ECF No. 126, PageID.2637.  Nor is there any indication that Adray fabricated the treatment record.  The medical record shows that Burton was examined and received some treatment after the February 2019 incident.

That Burton was given Tylenol and a bag of ice rather than taken to the hospital amounts to a disagreement with the care provided.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)

---

[4] The medical records only show that Burton complained of neck pain in kites dated February 15 and 16, 2019, and stated that Tylenol given to him by Nurse Wolf was not working.  ECF No. 110-7, PageID.2419-2420.

(cleaned up).  So "the fact that a prisoner disagrees with a course of treatment that was prescribed, or even that the treatment he did receive was negligently administered, does not rise to a constitutional violation." *Jennings v. Al-Dabagh*, 275 F. Supp. 2d 863, 870 (E.D. Mich. 2003).

Burton also offers no medical evidence showing that the treatment he received was inadequate or showing that the alleged inadequacy resulted in harm.  To prove that the medical care rendered was inadequate, "courts generally require [prisoners] to introduce medical evidence, typically in the form of expert testimony."  *Phillips*, 14 F.4th at 535.  Burton only offers his prison medical records, which do not suggest that Adray and McCoy's treatment was inadequate.  The record also lacks medical evidence linking Adray and McCoy's care to any detrimental effects.  *See Wagle v. Corizon*, No. 19-13787, 2023 WL 2749147, at *9 (E.D. Mich. Mar. 31, 2023) ("Nothing in the record suggests that Wagle was harmed by Defendants' failure to treat or diagnose a concussion or links any aspect of Defendants' treatment to Wagle's [current symptoms].").  Burton later had surgery on his right arm for carpal tunnel syndrome, but he had that condition before the February 2019 incident, and Burton points to no evidence suggesting that Adray and McCoy's care exacerbated his symptoms.  *See* ECF No. 110-3, PageID.1775; ECF No. 110-7, PageID.2158.

Nor can Burton satisfy the subjective element.  As described above, Burton complained to Adray and McCoy about his head wound and arm pain.  ECF No. 110-3, PageID.1775; ECF No. 110-7, PageID.2421. Adray's examination findings were unremarkable, as she noted that Burton's head wound was superficial; his range of motion was normal when he interacted with others; and he had no swelling, redness, or bruising on his arm.  ECF No. 110-7, PageID.2421.  Adray also stated that she never observed Burton experiencing a severe or obvious medical need.  ECF No. 110-6, PageID.1802.  Given the apparently minor injuries described in the medical record, there is no evidence that Adray or McCoy knew of and disregarded an excessive risk to Burton's health.

**2.**

Next, the Court addresses Burton's claim that Martino was deliberately indifferent by refusing to give him a cervical collar for his neck sprain.

Burton fails to satisfy the objective element of deliberate indifference. Burton was diagnosed with a neck sprain in March 2019 and was seen for the problem many times in the following months.  ECF No. 106-1, PageID.1532-1554.  X-rays of his cervical and thoracic spine revealed no abnormalities.  *Id.*, PageID.1538-1539, 1544.  In June 2019, Burton was

20

evaluated by a physical therapist, who found that he had significant pain and limited range of motion but was not a candidate for physical therapy. *Id.*, PageID.1553.  The therapist recommended that Burton needed a cervical collar and an EMG, MRI, or neurology referral to determine the cause of his pain.  *Id.*

Martino asked the ACMO to evaluate Burton's need for a cervical collar and an MRI.  *Id.*, PageID.1554.  The ACMO deferred review of the cervical collar as not medically necessary, pending further testing.  *Id.*, PageID.1588-1559.  The MRI was approved, but Martino later requested a CT myelogram instead because of bullet fragments in Burton's body.  *Id.*, PageID.1560-1561, 1565-1566.  The CT myelogram was approved, but the test required Burton to have bloodwork drawn in advance.  *Id.*, PageID.1573-1574, 1588.  Burton refused to have the labs drawn, claiming that he could not ride in the transport van without a cervical collar.  *Id.*, PageID.1577, 1580, 1587-1591, 1594, 1607, 1614-1617.  Martino and others explained that the ACMO did not approve the cervical collar and that medical would reevaluate the need for a collar after the CT myelogram, but Burton still refused to have the bloodwork.  *Id.*  Burton also returned from a medical visit to an outside facility wearing a cervical collar.  *Id.*,

21

PageID.1572.  The examining nurse called Martino, who directed him to confiscate the collar since it was unapproved.  *Id.*, PageID.1572.

Burton cannot dispute that he received treatment for his neck sprain, as he was seen many times by different providers, had x-rays, and was scheduled for a CT myelogram to determine the cause of his pain and to reassess his need for a cervical collar.  *See, e.g.*, *id.*, PageID.1532-1554, 1573-1574, 1580, 1588, 1614-1617.  As with Adray and McCoy, Burton has not shown through medical evidence or expert testimony that Martino's care was "grossly inadequate" or resulted in harm.  *See Phillips*, 14 F.4th at 535.  And Burton's claim that Martino denied him a cervical collar is a simple disagreement with the course of treatment, which does not amount to a constitutional violation.  *See Westlake*, 537 F.2d at 860 n.5; *Jennings*, 275 F. Supp. 2d at 870.

Burton also fails to satisfy the subjective element.  Martino did not disregard a substantial risk to Burton's health but followed the ACMO's order that a cervical collar was not medically necessary.  A nurse is not deliberately indifferent when she follows a physician's order, though she may not do so blindly or unthinkingly if the order poses an obvious risk to the patient.  *See Waddell v. Lloyd*, No. 16-14078, 2019 WL 1354253, at *5 (E.D. Mich. Mar. 26, 2019) (citing *Bauer v. Kramer*, 424 F. App'x 917, 919

(11th Cir. 2011); *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075

(7th Cir. 2012)).  The record does not show that Martino disregarded any

risk to Burton.  Rather, she repeatedly urged Burton to have the bloodwork

so he could have the CT myelogram.  Burton does not dispute that he

refused to cooperate.  "A voluntary refusal of treatment precludes and

Eighth Amendment claim," and "prison officials are not deliberately

indifferent to a prisoner's serious medical needs when the prisoner refuses

to accept medical treatment."  *Johnson v. Allen*, No. 1:15-cv-1329, 2016

WL 860428, at *4 (W.D. Mich. Mar. 7, 2016) (citing *Palmer v. Wagner*, 3 F.

App'x 329, 331 (6th Cir. 2001)) (cleaned up).

## 3.

The Court next considers Burton's deliberate indifference claim

against Rivard-Babisch for her refusal to give him an arm brace with metal

rods.

Once again, Burton cannot satisfy the objective element of deliberate

indifference.  Burton complained in February 2019 that his arm brace was

stolen while he was in segregation.  ECF No. 110-7, PageID.2412.  He was

given a new brace with no metal two days later, and he told the nurse that

he felt "much better" and left healthcare "in no apparent distress."  *Id.*,

PageID.2400.  When Burton complained that the new brace fit poorly,

Rivard-Babisch placed wooden tongue blades in it to provide more support. *Id.*, PageID.2393.  Burton returned to healthcare nine days later because officers had taken the tongue blades from his brace, and Rivard-Babisch replaced them.  *Id.*, PageID.2374.  In May 2019, Burton filed a grievance against Rivard-Babisch because she did not give him a metal arm brace.  ECF No. 36-5, PageID.572.

As with Burton's claims against the other medical providers, he cannot show the objective element of deliberate indifference.  Burton was provided an arm brace, just not the type he preferred.  He offers no medical evidence showing that using a non-metal brace was somehow inadequate or caused him some harm.  *See Phillips*, 14 F.4th at 535.  And his claim amounts to a mere disagreement with the proper course of treatment.  *See Serrano v. Folino*, 339 F. App'x 254, 257 (3d Cir. 2009) ("Serrano has established only that he disagrees with the prison's choice of knee brace for him, not that any officials deliberately disregarded a serious medical need.").

Nor has Burton met the subjective element.  Rivard-Babisch stated that physicians and physician's assistants—and not nurses—ordered the medical equipment for prisoners.  ECF No. 110-9, PageID.2438.  And Rivard-Babisch could not give Burton a metal arm brace because of

24

security regulations prohibiting prisoners from possessing objects with metal or plastic.  *Id.*  MDOC's denial of Burton's grievance against Rivard-Babisch also confirms that he was not allowed to have any metal or plastic in his possession, as verified by the acting deputy warden.  ECF No. 36-5, PageID.573.  Since Rivard-Babisch was complying with prison regulations, Burton fails to show that she deliberately disregarded a serious medical need.  *See Serrano*, 339 F. App'x at 257 (prison staff was not deliberately indifferent by offering plaintiff a plastic knee brace instead of a metal one, in accordance with prison security regulations).

Thus, Adray, McCoy, Martino, and Rivard-Babisch should be granted summary judgment on Burton's deliberate indifference claims against them.

**C.**

The last issue is Burton's retaliation claims against Adray, McCoy, and Rivard-Babisch.[5]  To succeed on his retaliation claim, Burton must show that: (1) he was engaged in conduct protected by the First Amendment; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that protected conduct; and

---

[5] Burton contends that Freiburger also retaliated against him.  ECF No. 118, PageID.2469.  But Judge Leitman held that Burton did not adequately plead a retaliation claim against Freiburger.  ECF No. 4, PageID.251, 254-255 ("To the extent that Burton brings a First Amendment claim against any of the other Defendants, those claims will be summarily dismissed.").

(3) "there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [Lippett's] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The Sixth Circuit imposes a "high burden" for the third factor; there must be some evidence of retaliatory motive, and conclusory allegations are insufficient. *Hill v. Lappin*, 630 F.3d 468, 475-76 (6th Cir. 2010). If the plaintiff proves those three factors, the burden shifts to the defendant; if he "can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399.

## 1.

Adray and McCoy argue that Burton cannot show that protected conduct led to the alleged retaliation or that he suffered an adverse action. ECF No. 110, PageID.1748-1750. The Court agrees.

During his deposition, Burton testified that he engaged in protected conduct by seeking proper medical care. ECF No. 110-3, PageID.1778. Seeking medical treatment is considered protected conduct in the Sixth Circuit. *See Wood v. Settles*, No. 1:20-CV-54, 2020 WL 1492762, at *5 (E.D. Tenn. Mar. 27, 2020); *Odum v. Hiland*, No. 5:12CV-P124-R, 2013 WL 2297071, at *6 (W.D. Ky. May 24, 2013). But when asked what conduct

26

led Adray and McCoy to allegedly deny him treatment against him, Burton claimed that they retaliated because an officer told them that Burton assaulted Stemen.  ECF No. 110-3, PageID.1778.  This evidence shows that the alleged retaliation was motivated not by Burton's protected conduct but by information relayed by a third party.  Burton cannot prove the causation element of a retaliation claim.

The evidence also does not support Burton's claim that he suffered an adverse action.  He claims that he was denied proper medical treatment for his injuries.  *Id.*  A denial of medical care can constitute an adverse action supporting a retaliation claim.  *O'Brien v. Mich. Dep't of Corr.*, 592 F. App'x 338, 343 (6th Cir. 2014).  But as discussed above, the medical records do not show that Burton was denied treatment.  Rather, he was examined and given Tylenol and a bag of ice.

Thus, Adray and McCoy should be granted summary judgment on the retaliation claim against them.

## 2.

Rivard-Babisch contends that there is a legitimate, non-retaliatory reason for the allegedly adverse action of denying Burton a metal arm brace.  ECF No. 110, PageID.1751-1753.

27

Burton claims that Rivard-Babisch denied him a metal arm brace in retaliation for a grievance he filed against her in May 2019.  *See* ECF No. 36-5, PageID.572; ECF No. 126, PageID.2633, 2635-2636, 2639.  Even if Burton could show the elements of a retaliation claim, Rivard-Babisch argues that she would have denied Burton's request for a metal arm brace despite the grievance.  As described above, Rivard-Babisch stated that nurses did not order the medical equipment for prisoners, and she could not give Burton a metal arm brace because of prison security regulations. ECF No. 110-9, PageID.2438.  The grievance denial confirms that Burton was not allowed to have any metal or plastic in his possession.  ECF No. 36-5, PageID.573.  Burton fails to rebut this evidence.  Since Rivard-Babisch has shown a non-retaliatory motive for her actions, she is entitled to summary judgment on the retaliation claim against her.  *See Good v. Walworth*, No. 17-10140, 2020 WL 2045399, at *6-7 (E.D. Mich. Mar. 30, 2020), *adopted*, 2020 WL 2043650 (E.D. Mich. Apr. 28, 2020) (summary judgment is proper when a defendant has shown legitimate, non-retaliatory reasons for an adverse action).

## IV.   Conclusion

The Court thus **RECOMMENDS** that Martino's motion for summary judgment be **GRANTED** (ECF No. 106) and that the MDOC defendants'

motion for summary judgment be **GRANTED IN PART AND DENIED IN PART** (ECF No. 110).  The excessive force claims against Freiburger and Patterson should proceed, but the claims against Adray, McCoy, and Rivard-Babisch should be dismissed.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: November 13, 2023

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and

recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections lack merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System to their email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 13, 2023.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager
